885 F.2d 464
 Blue Sky L. Rep. P 73,014, Fed. Sec. L. Rep. P 94,725,
9 UCC Rep.Serv.2d 1266
B.J. TANENBAUM, Jr., Appellant,
v.
AGRI-CAPITAL, INC.; James O. Young, Sabine Capital
Corporation; Worthen Bank & Trust Company, N.A.;
and First National Bank of Shreveport,
Appellees.
FIRST NATIONAL BANK OF SHREVEPORT, Appellant,
v.
B.J. TANENBAUM, Jr., Appellee.
 Nos. 88-1708-EA, 88-2132-EA.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1988.
Decided Sept. 15, 1989.
 
 1
 Michael J. Dennis, Pine Bluff, Ark., for appellant.
 
 
 2
 E. Harley Cox, Jr., Pine Bluff, Ark., for appellees.
 
 
 3
 Before McMILLIAN and BEAM, Circuit Judges, and HARPER,* Senior District Judge.
 
 
 4
 HARPER, Senior District Judge.
 
 
 5
 This is a consolidation of appeals by opposing parties of a jury verdict that resulted from a trial in the Eastern District of Arkansas. Plaintiff (hereinafter Tanenbaum) filed a claim for damages based on violations of the Arkansas and Federal Securities Acts. Defendants initially were First National Bank of Shreveport (hereinafter First National), James O. Young (hereinafter Young), Agri-Capital, Inc. (hereinafter Agri-Capital), Rob Thorpe (hereinafter Thorpe), and Worthen Bank & Trust Company, N.A. (hereinafter Worthen). Young, Thorpe and Agri-Capital settled with Tanenbaum prior to trial. A jury trial was held against First National with Worthen present as a nominal party. First National filed a counterclaim for collection of a promissory note. Judgment was entered against Tanenbaum and in favor of First National on its counterclaim. The judgment included an award of attorney's fees to First National. Tanenbaum appeals the judgment entered against him. First National appeals the amount of attorney's fees it was awarded, contending that the amount should have been considerably higher. The following facts give rise to these appeals.
 
 
 6
 On December 28, 1984, Tanenbaum and Longcrier Farms (hereinafter Longcrier) entered into a Breeding and Management Agreement (hereinafter Agreement). This agreement provided that Tanenbaum would purchase cattle embryos and Longcrier would place them in recipient cows, produce calves, raise the calves to maturity, collect high-breed embryos from those cows, and market the high-breed embryos. The total purchase price was $100,000.00. Tanenbaum paid $25,000.00 in cash to Longcrier and signed a promissory note for $75,000.00. The promissory note was secured by a letter of credit issued by Worthen. The note was made payable to Sabine Capital Corporation, which was established by Longcrier to receive investor notes and pledge those notes to banking sources in exchange for current funds. On November 27, 1984, First National prepared a loan committee presentation summary which reflected a tentative decision to loan funds to Sabine Capital Corporation based on the pledge of investor notes. On February 15, 1985, Tanenbaum's note was endorsed to First National.
 
 
 7
 On November 18, 1985, Tanenbaum was notified in writing that a lien had been placed on all of Longcrier's cattle. Tanenbaum later discovered that Longcrier had entered into bankruptcy proceedings. Tanenbaum failed to pay an interest installment, and First National drew upon the letter of credit. Subsequently, Tanenbaum and First National agreed to reinstate the Letter of Credit. Tanenbaum paid the interest through March 31, 1986, and then failed to make payments on the interest or the principal from that point on. Tanenbaum filed suit for damages based on violations of the Arkansas and Federal Securities Acts. Tanenbaum alleged that First National was an aider and abetter of the sale. First National counterclaimed for collection of the amount due on the promissory note. A jury returned a verdict for First National for $88,920.21, which represented the full amount of principal with accrued interest.
 
 
 8
 First National applied to the district court for attorney's fees and submitted a supporting affidavit claiming 365.20 hours of legal services at $125.00 an hour, for a total of $46,650.00. The trial court disallowed this amount on the ground that the supporting affidavit did not show a differentiation between the time spent in defense of Tanenbaum's claims of aider and abetter as opposed to time spent in collection of the promissory note, and was insufficient in supporting documentation. First National filed a supplemental motion and affidavit wherein the claimed hours were reduced from 365.20 to 210.30 at $125.00 an hour, making a total of $26,287.50. The district court awarded First National attorney's fees in the amount of $8,500.00 and costs in the amount of $428.05. Tanenbaum appeals the verdict in favor of First National. First National appeals the amount of attorney's fees which it was awarded.
 
 
 9
 In Tanenbaum v. First National, the issues on appeal are:
 
 
 10
 I. WHETHER THE TRIAL JUDGE ERRED IN FAILING TO DIRECT A VERDICT ON THE ISSUE OF WHETHER THE THING PURCHASED BY THE PLAINTIFF WAS A SECURITY AND ISSUE A BINDING INSTRUCTION TO THE JURY.
 
 
 11
 II. WHETHER THE TRIAL JUDGE ERRED IN DIRECTING A VERDICT THAT THE SALE OF THE SECURITY TO PLAINTIFF WAS THE SALE OF AN UNREGISTERED SECURITY IN VIOLATION OF ARKANSAS LAW AND DELIVER A BINDING INSTRUCTION ON THAT ISSUE.
 
 
 12
 III. WHETHER THE TRIAL JUDGE ERRED IN FAILING TO DIRECT A VERDICT AND ISSUE A BINDING INSTRUCTION ON THE ISSUE OF WHETHER THE PROMISSORY NOTE GIVEN FOR THE SECURITY WAS A NEGOTIABLE INSTRUMENT.
 
 
 13
 IV. WHETHER THE TRIAL JUDGE ERRED IN FAILING TO GIVE AN INSTRUCTION REGARDING THE NON-WAIVER PROVISION OF THE ARKANSAS SECURITIES ACT.
 
 
 14
 V. WHETHER THE TRIAL JUDGE ERRED IN GIVING CERTAIN INSTRUCTIONS PROFFERED BY DEFENDANT FIRST NATIONAL BANK OF SHREVEPORT WHICH WERE IMPROPER IN LIGHT OF THE APPLICABLE LAW.
 
 
 15
 VI. WHETHER THE ATTORNEY'S FEE AWARD WAS EXCESSIVE.
 
 
 16
 In First National v. Tanenbaum, the issues on appeal are:I. WHETHER TEXAS LAW GOVERNS THE PARTIES' RIGHTS RESPECTING THE NOTE.
 
 
 17
 II. WHETHER THE TRIAL COURT ERRED IN DISALLOWING ATTORNEY'S FEES INCURRED IN DEFENSE OF CLAIMS THAT THE NOTE WAS INVALID.
 
 
 18
 Taking up first the issues on appeal in Tanenbaum v. First National:
 
 
 19
 I. WHETHER THE TRIAL JUDGE ERRED IN FAILING TO DIRECT A VERDICT ON THE ISSUE OF WHETHER THE THING PURCHASED BY THE PLAINTIFF WAS A SECURITY AND ISSUE A BINDING INSTRUCTION TO THE JURY.
 
 
 20
 At the close of the evidence, Tanenbaum requested that the Court direct a verdict that the cattle embryo investment was a security as defined by Arkansas and Federal law, and requested that the Court give a binding instruction to that effect. The Court refused to do so. Tanenbaum asserts that the Court's refusal constitutes reversible error.
 
 
 21
 Arkansas law applies a five-part test to determine whether a particular interest is a security. This test mandates consideration of the following factors: (1) Investment of money or money's worth; (2) investment in a venture; (3) expectation of some benefit to the investor as a result of the investment; (4) contribution toward the risk capital of the venture; (5) absence of direct control over the investment or policy decisions concerning the venture. Smith v. State, 266 Ark. 861, 587 S.W.2d 50, 52 (Ark.App.1979), cert. denied, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980). The Supreme Court, in interpreting the analogous federal securities law, 15 U.S.C. Sec. 77b(1), defined three factors that must be met in order to classify a program as a security: (1) An investment of money, (2) in a common enterprise, and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor. Securities and Exchange Commission v. W.J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946).
 
 
 22
 Tanenbaum argues that the cattle embryo program clearly meets the criteria outlined in Smith for the following reasons: (1) He invested a total of $100,000.00 for his interest in the program. (2) The cattle-breeding program was a venture as defined by Black's Law Dictionary 1396 (5th Ed.1979), "An undertaking attended with risk, especially one aiming at making money; business speculation." (3) The program's offering memorandum shows that this program was designed to generate profit and income for its investors. (4) The program's offering memorandum shows how the initial investment is used to finance the overall breeding process. (5) Investors were required to execute Breeding and Management Agreements giving Longcrier the power to manage the program.
 
 
 23
 First National disagrees with Tanenbaum's assertion that the sale of pure bred cattle embryos pursuant to the management contract arrangement entered into by Tanenbaum and Longcrier constituted a security under both federal and state laws. First National concedes that Tanenbaum invested money in expection of a financial benefit, but contends that there were considerable factual disputes over the status of the program as a "venture," whether Tanenbaum lacked the opportunity for control over his property, and whether Tanenbaum was dependent upon Longcrier to manage the embryos.
 
 
 24
 The essential question is not whether Tanenbaum actually exercised his right of control over his property, but rather whether he retained ultimate control over the property. Schultz v. Dain Corp., 568 F.2d 612, 615 (8th Cir.1978); Fargo Partners v. Dain Corp., 540 F.2d 912, 915 (8th Cir.1976). First National argues that in this case reasonable minds might find that Tanenbaum possessed the requisite business experience to enable him to control his property and that he, therefore, was not dependent upon Longcrier to manage the embryos, the recipient cattle or the resulting calves.
 
 
 25
 Whether a question should be submitted to a jury upon proper instructions depends upon whether factual issues exist over which reasonable minds might disagree. Taylor v. Cochran, 830 F.2d 900, 902 (8th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1476, 99 L.Ed.2d 704 (1988). We find that the district court acted properly in refusing to direct a verdict on the issue of whether the cattle-breeding program was a security. This issue does not warrant reversal.
 
 
 26
 II. WHETHER THE TRIAL JUDGE ERRED IN FAILING TO DIRECT A VERDICT THAT THE SALE OF THE SECURITY TO PLAINTIFF WAS THE SALE OF AN UNREGISTERED SECURITY IN VIOLATION OF ARKANSAS LAW AND DELIVER A BINDING INSTRUCTION ON THAT ISSUE.
 
 
 27
 Arkansas law provides that the sale of a non-registered and non-exempted security is unlawful. Ark.Code Ann. Sec. 23-42-501. Tanenbaum introduced evidence in the form of a certificate from the Arkansas Securities Commission that the alleged security was not registered and that no proof of exemption from registration was made.
 
 
 28
 We have already determined that the trial court acted correctly in refusing to direct a verdict on the issue of whether the cattle-breeding program was a security. In view of that holding, we reject Tanenbaum's argument that the trial court should have delivered a binding instruction that Tanenbaum was sold as an unregistered security in violation of Arkansas law. Whether or not sale of this particular investment was in violation of Ark.Code Ann. Sec. 23-42-501 depends on whether the investment is classified as a security. The determination that the investment was or was not a security is a fact question, and before making this determination, the court needed to submit fact questions to the jury for resolution. This issue is, therefore, denied.
 
 
 29
 III. WHETHER THE COURT ERRED IN FAILING TO DIRECT A VERDICT AND ISSUE A BINDING INSTRUCTION ON THE ISSUE OF WHETHER THE PROMISSORY NOTE GIVEN FOR THE SECURITY WAS A NEGOTIABLE INSTRUMENT.
 
 
 30
 Tanenbaum contends that First National does not have the status of a holder in due course, and, therefore, First National is subject to defenses available to Tanenbaum against Savine, the original payee of the note. Tanenbaum bases his argument on the following language in the note which states that interest
 
 
 31
 " * * * shall accrue on the unpaid balance of this note (the Note) from time to time outstanding from the date hereof, at a rate per annum equal to the lesser of (i) 2- 1/2 per cent per annum above the London InterBank Offered Rate (LIBOR) or (ii) the highest rate of interest permitted under applicable law until the entire principal balance of this note is paid in full."
 
 
 32
 Tanenbaum argues that the note is non-negotiable because it is impossible for a prospective purchaser to compute from the face of the note the amount that is then payable. The prospective purchaser would necessarily refer to an outside source to determine whether the LIBOR rate or the highest rate allowed by law applies at any specific time.
 
 
 33
 A negotiable instrument must " * * * contain an unconditional promise or order to pay a sum certain in money * * *." Texas V.T.C.A. Bus. & C. Sec. 3.104. First National contends that the above language of the note meets the Eighth Circuit's criteria for "certainty," The test for "certainty" as it concerns the amount payable under an instrument for it to constitute negotiability is not mathematical certainty, but commercial certainty. Cudahy Packing Co. v. State National Bank of St. Louis, Mo., 134 F. 538, 542 (8th Cir.1904).
 
 
 34
 We agree with First National's suggestion that generally accepted commercial practices would be severely and adversely affected should we find that reference to standard published indices would render an instrument non-negotiable. The district court was correct in refusing to direct a verdict and issue an instruction that the note was non-negotiable, and this issue is denied.
 
 
 35
 IV. WHETHER THE TRIAL JUDGE ERRED IN FAILING TO GIVE AN INSTRUCTION REGARDING THE NON-WAIVER PROVISION OF THE ARKANSAS SECURITIES ACT.
 
 
 36
 The promissory note contained the following language:
 
 
 37
 "Obligations absolute: The obligations of the maker under this note are absolute and unconditional without defenses, setoffs, recaptures, claims or counterclaims, and shall remain in full force and effect until this note shall have been paid in full."
 
 
 38
 Tanenbaum requested an instruction based on the provisions of Ark.Code Ann. Sec. 23-42-109, which states:
 
 
 39
 "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this chapter is void."
 
 
 40
 Tanenbaum argues that the trial judge's failure to issue the proffered instruction misled the jury into believing that the note's waiver language was effective in that the failure to register or exempt the cattle embryo program did not constitute a violation of the Arkansas Securities Act.
 
 
 41
 First National argues that Tanenbaum has misapplied the language of the Arkansas Securities Act. The Act forbids the waiver of "compliance" with its provisions. We interpret this language to mean that a potential buyer of securities does not have the legal power to give the seller permission to sell any security to the buyer without first undertaking to comply with all the requirements imposed by the Act. The pertinent language of the promissory note does not purport to do that. The note's language merely states that Tanenbaum may not assert defenses as a means of escaping his obligations under the note. It does not attempt to state an agreement by Tanenbaum that compliance with the Act may be waived. This issue on appeal is denied.
 
 
 42
 V. WHETHER THE TRIAL JUDGE ERRED IN GIVING CERTAIN INSTRUCTIONS PROFFERED BY DEFENDANT FIRST NATIONAL BANK OF SHREVEPORT WHICH WERE IMPROPER IN LIGHT OF THE APPLICABLE LAW.
 
 
 43
 Tanenbaum challenges the propriety of four instructions that the trial judge gave which were proffered by First National. They read as follows:
 
 Court's Instruction No. 28:
 
 44
 "In order to find for First National Bank of Shreveport on its counterclaim and against B.J. Tanenbaum, Jr., and award judgment to First National Bank of Shreveport in the amount of the principal and interest due and unpaid on the note, you must find such of the following elements have been proved by a preponderance of the evidence:
 
 
 45
 "(1) That First National Bank of Shreveport acquired the note for value;
 
 
 46
 "(2) That it still is the holder and owner of the note;
 
 
 47
 "(3) That some or all of the principal and interest due under the terms of the note remain due and payable;
 
 
 48
 "(4) That First National Bank of Shreveport as the holder of the note has elected to declare the entire amount of the note due and payable; and,
 
 
 49
 "(5) That B.J. Tanenbaum, Jr., has either waived or cannot otherwise assert any defense which he may have to the obligation of his note or that he has no valid defense or setoff to his obligation under the terms of the note."
 
 Court's Instruction No. 29:
 
 50
 "An agreement by a buyer that he will not assert against an assignee any claim or defense which he may have against the seller is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense except as to certain defenses none of which apply in this case."
 
 Court's Instruction No. 31:
 
 51
 "You are instructed that under the law a party to an agreement may legally agree not to assert any claims which he may have against the other party to the agreement. In his promissory note originally payable to Sabine Capital Corporation, B.J. Tanenbaum, Jr., agreed that his obligations under the note were not subject to defenses, setoffs, claims or counterclaims. You are, therefore, instructed that to the extent First National Bank of Shreveport acquired the note of B.J. Tanenbaum, Jr., then no defense or setoff which otherwise would be available to B.J. Tanenbaum, Jr., against his obligations under the note are available to him against First National Bank of Shreveport."
 
 Court's Instruction No. 40:
 
 52
 "If you first find that First National Bank of Shreveport is entitled to recover on its counterclaim against B.J. Tanenbaum, Jr., but you further find that B.J. Tanenbaum has a valid defense to payment of his indebtedness on the promissory note, but you further find from a preponderance of the evidence:
 
 
 53
 "(1) that after B.J. Tanenbaum knew, or in the exercise of reasonable diligence should have known, of the facts upon which his defense is based,
 
 
 54
 "(2) that in reliance on agreements of Tanenbaum First National Bank of Shreveport repaid the sum of $75,000 to Worthen Bank & Trust Company to reinstate the letter of credit which Worthen Bank & Trust Co., had issued to First National Bank of Shreveport for the benefit of B.J. Tanenbaum; and
 
 
 55
 "(3) that to induce First National Bank of Shreveport to do so, B.J. Tanenbaum entered into an agreement with First National Bank of Shreveport timely to pay to it the amount of principal and interest due under the terms of the note; you may find that B.J. Tanenbaum thereby waived his defenses to the payment of the note and find for First National Bank of Shreveport on its counterclaim."
 
 
 56
 The basis of the challenge lies in Tanenbaum's contention that the instructions are improper because they contain an aspect of waiver instructing the jury that he could have waived defenses to the note. Tanenbaum repeats his argument here that the refusal by the district judge to give his proffered instruction regarding the inability to waive violation of the Arkansas Securities Act amounts to a mischaracterization of the law.
 
 
 57
 We reject Tanenbaum's argument for the same reason as that given under Issue No. IV above. This issue does not warrant reversal.
 
 
 58
 VI. WHETHER THE ATTORNEY'S FEE AWARD WAS EXCESSIVE.
 
 
 59
 Under this issue, Tanenbaum disputes the attorney's fee award to First National of $8,500.00 plus $428.05 in costs. His argument is that the award was excessive in light of the proof required to collect the promissory note as opposed to defense of the various securities law claims. First National has also appealed this award, claiming it was inadequate. This issue will be discussed further in connection with First National's issue on appeal. At this point, however, it is clear that the award was in no way excessive.
 
 
 60
 Taking up next the issues on appeal in First National v. Tanenbaum:
 
 
 61
 I. WHETHER TEXAS LAW GOVERNS THE PARTIES' RIGHTS RESPECTING THE NOTE.
 
 
 62
 The parties to the promissory note adopted the law of the State of Texas, where the named payee was domiciled and payments were to be made. Tanenbaum concedes, and we agree, that Texas law is applicable to First National's claim for attorney's fee under the note.
 
 
 63
 II. WHETHER THE TRIAL COURT ERRED IN DISALLOWING THE BANK'S ATTORNEY'S FEES INCURRED IN DEFENSE OF CLAIMS THAT THE NOTE WAS INVALID.
 
 
 64
 First National submits that the essential question to be decided under this issue is whether that portion of attorney's fees allocable to defense of Tanenbaum's claims against it are recoverable.
 
 
 65
 First National filed its initial affidavit in support of its motion for award of attorney's fees in which 365.20 hours were claimed at the rate of $125.00 per hour. The trial court denied this initial request because First National failed to distinguish between the amount of time spent in defense of Tanenbaum's claim of aider and abetter and the amount of time spent in collection of the note. First National filed a supplemental affidavit which included a detailed accounting of individual services by date, description, individual hours and allocable charges. This supplemental affidavit specified only the time spent pursuing the claim on the promissory note and reflected 210.30 hours at $125.00 per hour, totalling $26,287.50.
 
 
 66
 The district court, after having found "that the expenditure of over 210 hours of work is excessive for the collection of a $75,000.00 note," awarded attorney's fees to First National in the amount of $8,500.00. This amount reflects roughly 9.5% of the damages the jury awarded to First National in the amount of $88,920.21.
 
 
 67
 Texas law provides that recoverable attorney's fees include those incurred in defending claims that the contract giving rise to the attorney's fees were invalid. RepublicBank Dallas, N.A. v. Shook, 653 S.W.2d 278, 282-83 (Tex.1983). However, attorney's fees must be reasonable under the facts of the case and must also bear some reasonable relationship to the amount in controversy. Houston Lighting & Power Co. v. Russo Properties, Inc., 710 S.W.2d 711, 715 (Tex.App.--Houston [1st Dist.] 1986). The court should consider the following well-established factors:
 
 
 68
 "1. The nature of the case; its difficulties, complexities, and importance, and the nature of the services to be rendered by counsel;
 
 
 69
 "2. The amount of money involved, the client's interest at stake, and the amount of time devoted by the attorney and the benefit derived by the client;
 
 
 70
 "3. The responsibility imposed upon counsel, and the skill and experience reasonably needed to perform the services."
 
 
 71
 Id., at pp. 715-16.
 
 
 72
 In the RepublicBank case, it is true that the court allowed recovery of attorney's fees incurred in defending against a usury charge asserted by a borrower against a bank. However, the attorney's fees requested in that case amounted to ten percent of the principal and interest due on the note. The note in that case provided that attorney's fees were recoverable in the amount of ten percent of the unpaid balance, plus interest.
 
 
 73
 The amount of attorney's fees is a question of fact for the trial court and we will not disturb the award absent an abuse of discretion. Houston Lighting, at p. 716. First National has not shown an abuse of discretion. We find that the district judge's award of $8,500.00 in attorney's fees is reasonable and just based on the facts herein. This issue on appeal is denied.
 
 
 74
 Affirmed.
 
 
 75
 Circuit Judge BEAM concurs in the result only.
 
 
 
 *
 The HONORABLE ROY W. HARPER, Senior U. S. District Judge for the Eastern District of Missouri, sitting by designation